## NESMITH a. THE CLINTON FIRE INSURANCE CO.

*New York Superior Court ; Special Term, June,* 1858.

NEW TRIAL.—MOTION.—MISBEHAVIOR OF JURY.

A motion for a new trial on the ground of the misbehavior of the jury should be made before the judge who tried the cause, or if before another judge, it should be made upon a case actually settled.

Although a verdict will not generally be set aside merely because the jury have been approached, if it clearly appear that no injustice has been done, and the interference did not affect the result ; yet if it appears that they have been approached in such a manner as might have influenced the verdict, it should be set aside without reference to the source or the motive of the interference.

During the trial of an action turning upon much conflicting testimony, a juror listened to the statements of a third party attacking the credibility of the defendant's witnesses.

*Held,* that a verdict for the plaintiff must be set aside.

Motion for a new trial.

The action was one of thirteen cases brought by the plaintiff as assignor of one Achorn, upon as many insurance policies, issued by various companies, upon the ship Achorn. The vessel was destroyed by fire. The defence was, that the fire was set by the procurement of Achorn. The plaintiff had a verdict which the defendants now moved to set aside, and to have a new trial, on the ground of misbehavior of the jury.

*E. W. Stoughton,* for the motion.

*Gilbert Dean,* opposed.

PIERREPONT, J.—The defendants apply to the court to set aside the verdict in this case, on the ground that the jury were tampered with during the progress of the trial.

The interference complained of was not by the plaintiffs, and there is no evidence that they knew of it at the time, or promoted it in any manner. In such cases the court do not feel bound, as a matter of course, to set aside the verdict.

If it clearly appears that no injustice has been done, and that the conversations with the juror did not influence the verdict, the court will not disturb the finding, although they may severally censure or punish any attempt to tamper with the jury.

This motion is made before the case is settled, and before a different judge from the one who tried the cause—*a practice to be discouraged;* as the judge, not having the facts before him, finds it impossible to determine whether the jury have been influenced by the conversations complained of, and whether or not it is a clear case, where no injustice has been done.

This embarrassment was suggested by the court on the argument, and at the request of the counsel on both sides, I consented to hear the motion, with the understanding that I was to confer with the judge who tried the cause, and learn from him and his minutes what occurred upon the trial; so that in fact this case comes before me as upon a case made, or as upon the judge's minutes of the trial. As a rule, such a motion should be made either before the judge who tried the cause, upon his minutes, or upon a case actually settled.

This action was brought upon a policy of insurance effected upon the ship Achorn. The ship was built at Waldoboro, in the State of Maine, and was burned soon after she was launched, and before she was quite complete.

The vessel was insured by Achorn & Son, the owners, by various companies in New York, for $65,000, and the Boston companies had insured her for some $16,000 more. The defendants claimed that the ship was set on fire by the procurement of Achorn, who assigned the policy to the plaintiffs in this action.

The trial commenced on the 18th day of January last, and continued until the 31st of the same month. On the 1st of February last the counsel commenced summing up the cause, and on the 4th day of February it was submitted to the jury, who found a verdict for the plaintiff.

Soon after the trial (as stated in the affidavit of Mr. Sprout), he met one of the jurors, who told the deponent that during the progress of the trial Charles Barnes told him (the juror) that he had lived 18 years in Waldoboro, and was acquainted with the witnesses in this case; that they would swear to any thing for a

dollar; that the said Barnes applied these remarks to the witnesses for the defendants only; that said Barnes spoke of Watson, one of the defendants' witnesses, in particular, as a bad character; "that Achorn, the principal witness for the plaintiffs, was a very respectable citizen; that he had never heard any thing against him, and the said juror told the deponent that he was very well acquainted with said Barnes, and put confidence in what he said, and that during the said trial he related the conversations he had with said Barnes to one of the other jurors. That the deponent called upon said Barnes for the purpose of obtaining his affidavit of the conversations with the juror, but he refused to make the affidavit."

Application was made to the court to compel Barnes to attend and be examined, and a summons was issued for that purpose. He refused to obey the summons, and an order was made that he appear and be examined, or that an attachment issue against him.

In obedience to said order, Barnes was finally examined, and the decision of the court rests entirely upon his evidence. He testified he was a sail-maker now residing in New York, but formerly a resident of Maine; that he was acquainted with people in Waldoboro, and had passed through that place two or three times a year for twenty years; that he had known the juror spoken of for thirty years; that he formerly went to dancing-school with him, and the juror used to make all his dancing-pumps; that during the progress of the trial he had three separate conversations with the juror upon three different days; that the first conversation was in the entry of the court-room; the next was in the court-room itself, and the third at the juror's store in Nassau street; that the first conversation was on the second day of the trial; that the juror asked him if he was interested in the case; that he told him, "not at all, that he had a case of his own;" during the interval of the judge's illness, and on the second day of that interval, that he had another conversation with the same juror in the court-room sitting by the stove: Barnes says "the juror asked me if I was acquainted with any of the parties in this suit; I told him I was acquainted with one or two of the witnesses, and with the lawyers; that was all I think, that is, all the conversation that took place in the court-room at that time; I don't remember any thing else; I

believe he invited me at that time to call and see him; I called at his store before the case was through."

Barnes further testified as follows : I went in and told Rogers that since I saw him, I thought I would come in and talk about old times, and get him to make such a pair of pumps for me, such as he used to make ; we talked about our families ; I was acquainted with his wife before he married her; we talked about our old acquaintances ; I asked Rogers if he would make me a pair of pumps ; he said his hand was out, but he would recommend me to a place, and he did, and I went there ; I don't recollect where it was, or his name ; it was a French name, near Chambers-street, in Broadway ; I could not get a pair, and I went to the Bowery,—Mr. Weed's, in the Bowery, No. 80 or No. 82 ; these were dancing-pumps ; I got them last night, and ordered them a week or ten days ago ; I formerly went to dancing-school with Rogers, and he used to make all my pumps ; I wanted a pair of pumps for dancing, and have got them; I have a family, they live in Brooklyn; I keep house in Skillman-street, a few doors south of Myrtle ; I have a wife in Brooklyn and five children.

*Q.*—You say that during the second conversation you had with Rogers, you told him you knew one or two of the witnesses; did you tell him which of the witnesses ? *A.*—I did not.

*Q.*—Which of the witnesses did you know? *A.*—Arnold Blaney and Captain Pinkham.

*Q.*—Did you not tell Rogers, in some one of the conversations you had with him, that Watson was a hard character, or words to that effect ? *A.*—I don't think I did ; I don't remember that I did ; I could not have told him such a lie, as I did not know Watson.

*Q.*—Did you not, in some conversation with him, speak of Watson ; or did not he speak of Watson, or did he not speak of him to you ? *A.*—I think he asked me if I knew Watson ; I told him I did not, only what I had heard here on the trial ; that was all.

*Q.*—Did you not speak of some one or more of the defendants' witnesses to Rogers ? *A.*—I never asked him any questions about the witnesses on either side, because I did not go in there for that purpose.

(Question repeated.) *A.*—No, sir; I did not know more than what I have said; he asked me if I was acquainted with Blume, and I told him I was not, and he asked me if I was acquainted with Achorn; I told him I was not, only from reputation; I told him I had never heard any thing against him or about him, only as a ship-builder.

*Q.*—Did you not, in substance, tell him that Achorn was, or was reputed to be, a very respectable man, or words to that effect? *A.*—I don't remember that I did, only from reputation as a man; as a ship-builder.

*Q.*—Did you tell Rogers you had never heard any thing against Blume? *A.*—I told him I did not know any thing about him.

*Q.*—Did Rogers ask you if you knew Grant, or any member of his family? *A.*—He asked me if I knew any of the rest of the witnesses, and I told him no, not any of them, only Achorn by reputation.

*Q.*—Did you not tell Rogers you had lived in Waldoboro? *A.*—I never told him no such thing; he asked me if I had lived in Waldoboro, and I told him No, but I had passed through there two or three times a year for eighteen or twenty years.

*Q.*—Did you not in some conversation tell Rogers in substance that you were acquainted with Waldoboro people? *A.*—I don't know as I did any thing more than what I have stated; when he asked me about the location of the place, I might have told him what sort of place it was to build vessels at; he asked me about the place, and I gave him a little description of it, as near I could tell.

*Q.*—What did you say to Rogers about Achorn as a ship-builder? *A.*—I told him all I knew about Achorn was his reputation as a ship-builder; that is all I ever did know about him, and he did not ask me, and I did not tell him about it.

*Q.*—Did you give him to understand that Achorn made bad vessels? *A.*—No, sir;—nor good ones either. I did not say any thing about his ship-building at all.

*Q.*—Did you not, in some one of these conversations with Rogers inform him in substance that the defendants' witnesses, or some one of them, would swear to any thing for a dollar, or for some other sum? *A.*—There was a conversation, I think, after he had asked me about all those people: he said, "This is

a kind of a curious case, and I think there has been some pretty hard swearing;" I said "Yes, I know some of them would swear to any thing for a dollar;" I don't remember of any thing else; I will tell you just what I said; it was about what I have above stated.

*Q.*—Was this the second conversation? *A.*—No, it was the third conversation in his store, when I went to see him about the pumps.

The plaintiffs deny that they knew any thing of these interviews, and there is no evidence that they did.

It is quite plain that Barnes made himself very active in this case, and that for some cause he desired to disparage the defendants' testimony. Whatever were his motives, or whether, without specific motive, he acted as a mere meddler in other men's affairs, he deserves severest censure and even punishment. When suitors come before a court of justice, they have a right to repose with entirest confidence in the belief that no juror will be approached, and that no suggestions will be made to any one of the panel except in open court, and in presence of both parties. The moment this confidence is shaken, that moment justice will cease to be expected through the courts of law, and men will seek to gain their ends by violence and fraud.

When a jury have been improperly approached, it is not easy to prove who or what moved the person to tamper with them. It is enough that they have been tampered with in such manner as might have influenced their verdict; and in every such case the court will set the verdict aside without hesitation.

It should be made the interest of both parties to prevent, as far as possible, all improper interference with the jury; and though in a particular case the rule may operate with severity, yet it were far better that ten righteous verdicts should be set aside where the jury have been tampered with, than one verdict should stand where the jury have been approached, and about the justice of which verdict the court entertains a doubt.

This was a case of conflicting testimony; a case where the witnesses on the different sides swore directly opposite to each other, and about matters which did not admit of honest mistake. It was eminently a case turning upon the credit given to the witnesses.

The juror to whom the communications were made would naturally enough speak of the witnesses in the jury-room.

It was competent for the plaintiff to offer the affidavits of the jury to sustain their verdict on this motion, but with the most ample opportunity no such affidavits are offered.

Jurors seem not to be aware of the gross impropriety of conversing with other persons about the case on trial before them. Hardly any act can be more reprehensible. Jurors are sworn to try the cause according to the law and the evidence. That is not evidence to which the juror listens out of court, when there is no opportunity to meet it, and no chance for cross-examination; and yet it influences the mind, tends to the grossest wrong and injustice, and is a violation of the most sacred obligations of a juror.

I cannot say that the communication complained of may not have influenced the jury. The cases are numerous, both English and American, where verdicts have been set aside on much slighter grounds.

The verdict in this case must be set aside, and a new trial ordered, with costs to abide the event.